FILED-KZ
June 12, 2019 2:45 PM
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
jlb   Scanned by ___ 6/13/19

1:19-cv-466
Paul L. Maloney
United States District Judge

1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT

9          WESTERN DISTRICT OF MICHIGAN

10

11   DON R. BUDD, IN PRO SE                      No.
     100 Minges Creek Place, F-111
12   Battle Creek, Michigan 49015-4285
     **TTY ONLY** (269) 979-8516,
13
14              Plaintiff,

15        v.                                      **COMPLAINT**

16   (1) SUMMIT POINTE                            **ISSUES:**
        140 West Michigan Avenue
17      Battle Creek, Michigan 49017       **1.  ADA, Title III (42 U.S.C. section 12182)**
        Voice (269) 966-1460
18                                          **2.  Section 504 (29 U.S.C. section 794)**
     (2) SUMMIT POINTE SOUTH
19      3630 Capital Avenue, SW            **3.  Persons with Disabilities Civil Rights Act**
        Battle Creek, Michigan 49015           **(MA 220 of 1976 Sec. 37.1101-.1607)**
20      Voice (269) 979-8333,
                                            **4.  Medical Malpractice (MCL 600.2912)**
21   (3) BATTLE CREEK HEALTH
        SYSTEMS (now dba: BRONSON          **5.  False/Unlawful Imprisonment**
22      HEALTHCARE GROUP)                      **(Restatement (2nd) of Torts, Section 31)**
        601 John Street
23      Kalamazoo, Michigan 49007
        Voice (269) 341-8721,
24
     (4) Fieldstone Center (now dba:
25      BRONSON BEHAVIORAL HEALTH
        SERVICES)
26      165 North Washington Avenue
        Battle Creek, Michigan 49017,
27   Does 1-100, Defendants.

28

1

Budd0001

Here comes the Plaintiff, Don R. Budd in Pro Se, not of free will but out of necessity, since discrimination also extends to law offices in the District of Michigan. None will accept a Deaf client. The only ADA Attorney in Battle Creek claims they fight the ADA, not enforce it. Disability Rights Groups all tell me my issues are not worth their resources and therefore, will not take my complaints.

Because of the issues raised in the **Case Background** Section of this complaint, the problems cannot be decided by a Magistrate or Arbiter. The US Secret Service's threat of "Must be found Mentally Ill or deemed a Terrorist" cannot resolve by a lower level judge or arbiter.

Please,  assign to the District Judge with authority to resolve such issues and place the Plaintiff under the Court's protection should it deem necessary to protect the Plaintiff and technology from government seizure.

**Jurisdiction**

"The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." (28 U.S.C. section 1331) Since the laws in question are the requirements of the Americans With Disabilities Act (ADA), Title III (42 U.S.C. section 12182 "Prohibition of discrimination by public accommodations") and Section 504 of the Rehabilitation Act (Section 504)(29 U.S.C. section 794) this district court has jurisdiction under 28 U.S.C. section 1331.

"Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such

2

Budd0002

1   supplemental jurisdiction shall include claims that involve the joinder or

2   intervention of additional parties." (28 U.S.C. section 1367) Because the

3   underlying issue of Medical Malpractice is a State jurisdiction and

4   substantially related to the Federal Issues of this complaint, this district court

5   has supplemental jurisdiction over the Medical Malpractice Issue as well.

6   **Case Background:**

7       This case arose out of a response to President George W. Bush's

8   request for ideas to Protect the United States after the events of 9/11/2001.

9   Within 2 weeks after submitting my technology summaries, I returned to my

10   Reno, Nevada, home to see a Soldier in Summer uniform climbing out of my

11   bedroom window. I was unable to confront the intruder. I learned he had

12   installed a backdoor on my computer and did other actions in my home. The

13   evidence will be presented in court.

14       I traced the backdoor first to IBM. After notifying my coworkers on the

15   project of the threat, it changed to the US Naval Research Laboratory. The

16   evidence will be presented in court.

17       I moved from Reno, Nevada, to Battle Creek, Michigan, in July 2003,

18   the surveillance continued. Two cars were noted as hanging around my

19   home. I took down their license plate numbers and showed the numbers to a

20   Kalamazoo Sheriff Deputy, who lived below me, he stated they were both

21   government vehicles. That was all that was listed for them.

22       After notifying the Emmett Township Police about the problems, an

23   officer and a man, Michael Cupp, claiming to be an IT Specialist, came to my

24   home. The officer ordered me to show Cupp one of my projects. While I was

25   complying with the order, the officer left the table. When I looked to see

26   what he was doing, I saw he was going through cabinets, refrigerator, and

27   other things. There was no interpreter present. I told them to leave because

28   it was an illegal search of my home (Violation of the 14th Amendment of the

Budd0003

US Constitution, Illegal Search and Seizure Clause). Mr. Cupp is now a
Psychologist for Summit Pointe South.

On or about May 12, 2006, Officer Rugg of Emmett Township Police
came and took me without explanation or interpreter from my home to Battle
Creek Health System (now dba Bronson Healthcare Group). I was handcuffed
and transported as a criminal without explanation from there to Fieldstone
Center (now dba Bronson Behavioral Health Services), the local Mental
Hospital. I was seen by Dr. Georgina Srinivas Rao, of Middle Eastern descent.
There was a Sign Language Interpreter present. I was told that I was being
evaluated for mental illness based on the officer's note that I spent more
money on technical texts than on food. How was that a ground's for putting
someone in a mental hospital? Technological books are more expensive.
Before Dr. Rao released me, I was asked to meet her for another interview.

At the second interview with Dr. Rao at Behavioral Health Resources
(now DBA Summit Pointe South) on or about June 1, 2006, I still was not
informed of what was going on other than the officer claimed I spent too
much on books and not enough on food. This time my brother was present.
She asked if she could speak with him alone. I still do not know what she
talked to him about, but it seems he was brought into the scheme that was
to play out.

After this, I learned my home had been bugged, wiretapped, and
cameras installed. All, of course, was denied. Then in early June 2006, a
Secret Service man, "Jason," came from the Grand Rapids office to speak
with me through a Sign Language Interpreter, Roxann Duncan.

He explained to me that someone in Washington, DC claimed to have
received a threat against the President from me. He stated that I must either
be found mentally insane, or I will be deemed a terrorist and be taken to an
unknown location for the rest of my life. I told him I never made the threat.

4

From that point to June 28, 2006, people started to hang around my home. I documented this and showed it to the Kalamazoo Sheriff Deputy, who verified that they were government vehicles and people. The Emmett Township Police had other excuses like one man was a Post employee having lunch in front of my home. Post Foods was some 4 to 5 miles away. No one had ever gone there in the back 40 of an apartment complex to have lunch. The other suddenly left when he saw me looking at him with a camera.

I tried to tell my brother what was happening, but uncharacteristically of him, he refused to look at the evidence. He could have seen it all over the apartment. He sided with the others, who eventually led me to a pond located over a half-mile in the woods, far from anyone's usual presence.

On or about June 28, 2006, under threat that I would be deemed a terrorist and vanish if I did not play along with the scheme, Cupp had me get into the pond and wade. When he was done, I was told to go back. On the way, I met 5 men all wearing red polo shirts with the words "Renaissance Faire."  The Faire was in the area at the time. They told me I was to be taken to Vandenburg AFB in California where I would live out my life in prison.

The Emmett Township Police arrived with 2 officers, one was Officer Rugg and the other was unnamed. They took me in the rescue ambulance and started to threaten me. I had to keep my feet in a prescribed manner, or I would be "Castrated." The threats continued all the way to the main hospital.

There I was ordered to dress in a hospital gown and keep my feet as prescribed. Most, I could not understand. There was never any interpreter. I was threatened repeatedly by staff, who later belonged to Fieldstone Center.

Finally, before I was transferred to Fieldstone Center, a doctor, who I could not make out the name, handed me only the signature page and she pointed to the place to sign. I was not allowed to read the document. I was

5

threatened more to sign. I signed the document under duress and threat of death. The document must be deemed null and void.

**ISSUE 1: VIOLATION OF ADA, ISSUE 2: SECTION 504, ISSUE 3: MICHIGAN PERSONS WITH DISABILITIES CIVIL RIGHTS ACT 220**

After I was transferred to Fieldstone Center and met Dr. James Gandy, who took me into the interview room without an interpreter. I could not understand much of what was going on. I told him I was Deaf and needed a Sign Language Interpreter. I handed him two medical reports: (1) showing my deafness (by Drs. J. Preston and Donald M. Nockleby) and (2) showing my right shoulder and arm are severely damaged (by Dr. Aubrey A. Swartz). Dr. Gandy did not read either. He simply set them aside and continued the interview without complying with the ADA, Michigan Persons with Disabilities Act 220 of 1976, or Section 504 requirements to provide an ASL Interpreter.

It did not matter how I responded, the diagnosis was already made before we even met. Dr. Gandy also refused to examine any of the evidence I attempted to provide showing the reality of the events leading up to this meeting. Dr. Gandy seemed distant and cold. He ordered something, which I later learned was 1MG of Risperdal. At the time, I could not understand why I was being given medication. I later learned when Dr. Gandy gave me a book entitled, "Surviving Schizophrenia" by E. Fuller Torrey, MD.

I read the book to find out what was going on. As I read the criteria for Schizophrenia, which could be applied to anyone the doctor chose.

I was subjected to several diagnostic tests, of which none showed any sign of Schizophrenia. I also began to have a very unnerving reaction to the Risperdal. I informed Dr. Gandy that I was becoming so restless that I felt like I was coming out of my skin. He only raised the dose and the symptoms magnified. So, he raised it again. The symptoms continued to worsen. Now, even though I have been off Risperdal for 13 years, I cannot relax or sit still.

6

I go for days, even months with very little sleep. I have now been diagnosed with **Tardive Dyskinesia (Akethasia)** which is the involuntary restlessness and uncontrollable movements I must now live with for the rest of my life because of a chemical change in my brain.

Through all the doctor visits and workshops for the 3 weeks, I was falsely imprisoned in the mental hospital, I was never once allowed to have access to an interpreter or a TTY to call family or anyone else, although the hearing patients were allowed free access to the two voice phones. I asked for a TTY but was denied. My rights were discarded entirely for the whole time I was in the hospital.

I tried, to no avail, to go through the Michigan Department of Civil Rights and Fieldstone Center claimed they had 13 people claiming I understood fine. My doctors' report showing not one, but two doctors who did extensive testing diagnosed me with the inability to process sound. Fieldstone's staff are not qualified to make such a decision. Yet, the State of Michigan accepted their excuse. The problems with the Michigan Department of Civil Rights choosing to ignore discrimination and blackmail of Deaf citizens has been turned over to the US Department of Justice for Violations of Title II of the ADA and Section 504 as well as blackmailing Deaf people into useless agreements MDCR refuses to enforce.

Title 42 U.S.C. section 2000d states "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." The list of persons protected was increased to include those with disabilities in Executive Order 13160, June 3, 2000, 65 F.R. 39775, and also the ADA (1990). This includes those with Hearing Impairments.

Budd0007

For the Defendants to receive Federal funds, they must agree to abide by the requirements of Federal standards. Failure to comply exposes the Defendants to Judicial review as to their ability to continue to receive Federal funds and/or repay all Federal funds received by the Defendants. (42 U.S.C. section 2000d-2)

These standards require the Defendants to provide Sign Language/Oral Interpreters, assistive listening devices, TTYs, Videophones, and other accommodations for the Hearing Impaired Patients/Customers. The Defendants repeatedly failed to provide these accommodations to the Plaintiff. Even now, after 13 years of being on notice, the Defendants have continued to fail to provide accommodations at every appointment. They only provide interpreters occasionally.

On October 30, 2018, when asked why there was no interpreter for me, Tanesha Sanders told me (African-American, Female, support staff), "I requested one, but no one responded." The law states, "Provide" not "Request" an interpreter. This requires due diligence, meaning all steps must be taken to secure an interpreter for every appointment.

On October 31, 2018, I requested a letter from Dr. Gandy regarding my Hearing Impairment. I did not hear from anyone for a week. So, I returned to Summit Pointe South on November 7, 2018, to find out what was happening. I needed the document for a case before the Michigan Department of Civil Rights. They told me there was a problem, but no one informed me, and no one intended to notify me. I was just let go. I had to go to Summit Pointe central office downtown. It took until February 28, 2019, to get the letter from Dr. Gandy. Problems included not knowing to call me through the Relay (711) and that my phone number was "(111) 111-1111" (notified by Amber Whoolery of Summit Pointe Compliance Office – now replaced). No attempt was ever made in 13 years to verify my phone number

8

despite the apparent error. All phone numbers are assumed Voice numbers by staff. They must contain numbers by type of phone wherever the phone number appears. I ended up losing the case because of the incompetence of the Defendants and their failure to accommodate a Deaf Patient/Customer.

The Defendants refused to accommodate the Hearing Impaired, and as far as I know, I am the only one they service. All advertisements on TV they ever used excluded the Deaf Community by not using captions or interpreters and minimal printed words. Their focus is strict to the Hearing Community. Their staff is not trained to deal with the Hearing Impaired, and their computer systems do not accept phone numbers for TTY, Videophone, Textphone, or other types of technology the Deaf must depend upon to communicate. So, all staff assumes all numbers are Voice.

Since Schizophrenia and other Mental Disorders are culturally based, they failed to accommodate the culture of the Deaf Community and diagnose a Deaf person as having "Paranoid Schizophrenia" according to the Hearing culture when in fact the person does not have "Paranoid Schizophrenia" according to Deaf culture. The Defendants' doctors and staff have no training to deal with the Deaf Community, and therefore the diagnosis I have been given cannot stand as it violates my civil rights and is based on prejudice rather than medical facts. This prejudice has caused irreversible brain damage, which is inexcusable. All attempts to change medications have failed to calm the **Tardive Dyskinesia (Akethasia)**. There is still no medical evidence that I have any form of Schizophrenia. Once I was in the mental hospital, all the games stopped and nothing ever happened again, even before the medications began. Therefore, medicines are not affecting the "Disease." There is no disease present.

The diagnosis is false and based on players in a scheme to silence me and keep others from believing in the technology I developed. This

9

Budd0009

1  technology will be presented in court.

2  **ISSUE 4: MEDICAL MALPRACTICE**

3  "Sec. 2912 (1) A civil action for malpractice may be maintained against
4  any person professing or holding himself out to be a member of a state
5  licensed profession. The rules of the common law applicable to actions
6  against members of a state licensed profession, for malpractice, are
7  applicable against any person who holds himself out to be a member of a
8  state licensed professional.

9  (2) Malpractice may be given in evidence in defense to any action for
10  services rendered by the member of a state licensed professional, or person
11  holding himself out to be a member of a state licensed profession." (MCL
12  600.2912)

13  Notice of Medical Malpractice Action against the Defendants Now Given.
14  As MCL 600.2912b requires Notice of a Medical Malpractice Action is given
15  before the commencement of such an action. Since the Case has been filed
16  with the U.S. Department of Justice since December 28, 2018, and no
17  response has been forthcoming, I must file myself before the 300-day statute
18  of limitations expires. State law (MCL 600.2912b) requires 182 days of notice
19  before an action can take place. The two laws herein conflict with each other.
20  Since the main focus of the Complaint the Federal Issues 1 and 2 and
21  Michigan State Issue 3, this Complaint must be filed before the 182 days
22  end. So, comingled is the Medical Malpractice Issue with the Federal Issues,
23  all four issues must be handled together.

24  Because I do not have the luxury of legal counsel, I must do all the
25  work myself, and this takes time to find all the applicable laws, Federal and
26  State. I must first go by Federal Deadlines as they hold the priority and then
27  State law, which is secondary.

28

Budd0010

The facts of the Complaint meet the requirements for MCL 600.2912b(4)(a)-(f). The Medical Malpractice Issue arises out of the refusal or failure to provide the Sign Language Interpreter and therefore have adequate communication between Doctor and Patient. This poor communication led to the injury of **Tardive dyskinesia (Akathisia)**, a life long debilitating condition.

Had there been proper communication and the inclusion of the Deaf Culture in the diagnosis process, this condition and the false diagnosis could have been avoided. Here are the four elements of Medical Malpractice.

**A. Doctor/Patient Relationship**

When I entered Fieldstone Center, the Mental Hospital, I was seen by Dr. James Gandy. This established the Doctor/Patient Relationship that continues today, although I now see him at Summit Pointe or Summit Pointe South. I had also been treated by several other doctors and staff over the years who all depended upon Dr. Gandy's diagnosis. None of them ever questioned his diagnosis, or the methods used to make the diagnosis. My objections were met with telling me I lacked affect, meaning I had no knowledge of the presence of the disease. Nothing I said or tried to present made any difference to anyone. The diagnosis was set before I ever met Dr. Gandy.

The only reason I went along with the game was that I was told I was under a Federal court order to be treated for a mental disorder or be deemed a terrorist. I had no choice but to accept my situation.

**B. Doctor Negligence**

Because of Issue 1: Violation of the ADA, Issue 2: Section 504 and Issue 3: Michigan Persons with Disabilities Act 220, there was no proper communication between Dr. Gandy and the Plaintiff or any of

11

the other doctors and staff for the 3 weeks the Plaintiff was in the mental hospital under false pretenses. Because of the lack of proper communication, there cannot be an appropriate diagnosis of a mental disorder.

Since the diagnosis of Paranoid Schizophrenia is culturally based, the basis of the diagnosis must be the Deaf Community rather than the Hearing Community. I am Deaf, not Hearing. Dr. Gandy was presented with the medical evidence of my deafness. However, he declined to include it in his evaluation. This is substandard medical care. Even today, my deafness is not included in any assessment. It does not matter rather or not, I have an interpreter present for the review. It still goes on.

I have a terrible reaction to every medication the doctors and staff try. Still, I am said to be "Paranoid Schizophrenic." There is no medical proof I have the condition at all. Just vague generalities that can be applied to anyone the doctors choose. All evidence I tried to show that the events were real was denied and refused to even examine. The diagnosis was decided before I ever met Dr. Gandy. This is by nature, Medical Malpractice.

According to "Jason" of the US Secret Service, Grand Rapids, Michigan, Summit Pointe was contracted to find me either mentally ill or a terrorist. The Defendants had adverse motivation to come up with this diagnosis despite any and all evidence to the contrary I attempted to present. This is medical negligence.

## C. Injury to Specific Damages

"The diagnosis of **Tardive Dyskinesia (Akethasia)** has never been disputed. It is a side effect of antipsychotic medications. These drugs are used to treat schizophrenia and other mental health disorders.

Budd0012

**Tardive dyskinesia** causes stiff, jerky movements of your face and body that you can't control. You might blink your eyes, stick out your tongue, or wave your arms without meaning to do so.

**Tardive dyskinesia** can be hard to diagnose. Symptoms might not appear until months or years after you start taking antipsychotic medicine. You can get **tardive dyskinesia** (TD) if you take an antipsychotic drug, usually for three months or more. But there've been rare cases of it after a single dose of an antipsychotic medicine."

#### These quotes from WebMD give an idea of what Tardive dyskinesia is and what causes it.

The response to drugs like Respirdal, in my case, was acute. When I first started to have problems with **Tardive dyskinesia**, I told Dr. Gandy the best I could. He was aware of the issues with the medication and the risks. This was not passed on to me as there was never an interpreter present. This lack of proper communication between Doctor and Patient rose to substandard medical care. Unable to communicate correctly what was happening, Dr. Gandy doubled the dose from 1 MG of Respirdal to 2 MGs of Respirdal a day instead of changing to one of the many alternative drugs. The problems did not decrease. Instead, they increased drastically. However, instead of changing medications, Dr. Gandy again raised the dose to 3 MGs of Respirdal per day. I was unable to sleep this whole 3 weeks. My motions (rocking, tongue movements, etc.) were out of control.

#### 1. Physical Damages – Visible

Finally, at the end of 3 weeks, Dr. Gandy changed my medication. However, by that time, it was too late. **Tardive dyskinesia** was now a permanent disability that has never be brought under control for the past 13 years. It is unlikely

Budd0013

anything can be done now. Currently, I am on Lorazepam ½ MGs a day. This is all of the medication I can tolerate. Any more of Lorazepam and I can not function at all.

For ten years, I had not slept more than 2-3 hours a day. I could not and still cannot relax enough to sleep. I have to go until I literally crash. This means it does me no good to go to bed before 2-3 AM and I must get up at 7 AM the same morning. For me, it is quite a feat as I usually get only 2-3 hours sleep a night. To put a dollar amount on this brain damage is difficult to do, especially for someone who was only 49 years old and have to live with this for the rest of my life (The longest anyone has lived in my family is to age 86.) The stress of this condition is very hard on the mind, psyche, and other organs like the heart. My blood pressure has been raised significantly, and I must now be on blood pressure medications. The medical costs for the lifetime of dealing with **Tardive dyskinesia** will be extremely high. At the moment, I have health insurance to help. However, this will soon end.

### 2. Social Damages – Visible and Invisible

The social consequences of **Tardive dyskinesia** cannot be quantified. People are often very nervous around people with this condition. Many people stay away from me thinking something serious is wrong with me and that I am not safe to be around. I often have to spend much time explaining to people what is wrong. When I encounter law enforcement, they immediately suspect drug abuse. Children, even in my own family, shy away from me because of the constant movements that they do not understand. It scares them.

14

Budd0014

**D.     Improper treatment**

Because of the total disregard for my Civil Rights and the need for a Sign Language Interpreter, a false diagnosis was given and therefore, the wrong medication, Risperdal, was given. The Defendants' total disregard for my medical care caused irreversible brain damage.

Had the Defendants' given proper medical care and appropriate evaluation, I would never have been diagnosed with a disease I never had in the first place.

However, The US Secret Service contracted Summit Pointe to diagnose me either as Mentally Ill or a Terrorist. This led to my being falsely diagnosed as being "Paranoid Schizophrenic" despite the evidence I tried to present to show the events were real.

This improper treatment of the Plaintiff continues to this day.

With most appointments having no interpreter, but I must go to get my medications.

**ISSUE 5:   FALSE/WRONGFUL IMPRISONMENT**

A false/wrongful imprisonment charge requires 4 elements to be proven: 1) Intent; 2) Actual confinement in boundaries not of Plaintiff's choosing; 3) A causal link, and 4) Awareness of the detention **(Restatement (2nd) of Torts, Section 31)**. "[t]he essence of false imprisonment is the intentional, unlawful, and unconsented restraint by one person of the physical liberty of another."

**1. Intent**

According to "Jason" of the US Secret Service, Summit Pointe had been contracted to find the Plaintiff either Mentally Insane or a Terrorist. Thus, the Defendant had a motive to restrain the Plaintiff. Without having a lawful ground to do so, an unlawful

15

means had to be used. In so doing, the doctor at Bronson
hospital and Dr. Cupp forced the Plaintiff to sign a document
under duress, which the Plaintiff was not allowed to read.
Therefore, no legal consent was ever obtained to confine the
Plaintiff to a mental hospital. The Defendants had an ulterior
motive to their actions. The Plaintiff was never given a copy of
the said document.

## 2. Actual confinement in boundaries not of Plaintiff's choosing

The Defendants confined the Plaintiff in the Defendant Mental
Hospital from June 28,2006 for 20 days. This was done without
the Plaintiff's Informed Consent. The Plaintiff was subjected to
repeated threats and placed under duress for hours before he
was taken to Fieldstone Center. Each of the people involved in
the incidents at the main hospital was later found employed by
Fieldstone Center as male nurses and other staff.

## 3. A causal link

The link between the events leading up to the stay in Fieldstone
Center was meant to ensure Dr. Gandy had reason to believe the
Plaintiff was mentally ill and having a mental breakdown. The
Defendants had multiple people involved to ensure that there
were enough "witnesses" to the events to make the scheme
plausible for the doctor to make a decision. Even if there were
hundreds of "witnesses," false testimony is still wrong.
The entire scheme is built upon the doctrine of Plausible
deniability" so often used by the federal government to weasel its
way out of hard cases. It claims that the federal government
won't do such things against its own citizens. Just look at what

16

was done to Candidate Donald J. Trump and the Russian Dossier.
He is a public citizen. Just think of what is being done to private
citizens who have no access to high-priced lawyers to protect
them, especially a Deaf person who cannot obtain a lawyer at
any price. Believing such things don't happen in America is
utterly foolish.

**4. Awareness of the confinement**

Plaintiff was aware of his detention but had no choice in the
matter. There were too many people involved in the scheme to
do anything about the events. Staff informed the Plaintiff that if
he left, they would call the police and have him brought back.
Why would they say that, if it was voluntary in the first place?
The Plaintiff did attempt to show Dr. Gandy that the events the
Plaintiff was describing were real. However, Dr. Gandy refused to
look at the evidence or pay any attention to the Plaintiff's side of
the story. Things were already decided.

The Plaintiff was told he was under a federal court order, by staff,
to remain in the Defendant Mental Hospital and that he must
undergo treatment for the mental illness for the rest of his life.
It wasn't until May 6, 2019, that Dr. Gandy finally informed the
Plaintiff that there was no federal court order involved. Each time
the Plaintiff was forced into Summit Pointe under a false
representation of a federal court order is still false imprisonment.
The Plaintiff was being Subjected to false imprisonment each and
every time the Plaintiff was misled into believing he had to
appear or be forced back into the mental hospital again.
The only reason to continue to see Dr. Gandy or anyone else is to
get the medication to calm the effects of **Tardive Dyskinesia**.

17

**JUDGMENT SOUGHT:**

Plaintiff now requests the Court to grant review in favor of the Plaintiff on the issues of Violations of the ADA, Section 504, and the Michigan Persons with Disabilities Act 220. Also, the Plaintiff requests this Court to grant review in favor of the Plaintiff on Violations of Medical Malpractice and False/Unlawful Imprisonment. Plaintiff requests judgment against each and every Defendant named herein.

Plaintiff acknowledges that although the following amounts are the maximum allowed for Civil Cases by Congress as of 2013, the District Judge has the final say as to the fine(s) awarded in this case.

On the **ADA and Section 504 Issues**, the Plaintiff requests fines for each of the 20 days the Plaintiff was held in the Defendant Mental Hospital, Fieldstone Center (now DBA Bronson Behavioral Health Services) in the maximum amount allowed currently as **$150,000 (as 2013 and raised 7.1% per year thereafter)  per day for a total of $3,000,000.** This is for each issue. Plus all Defendants must be denied Federal funds for 10 YEARS and until Defendants prove in this Court that they have resolved all federal violations, especially regarding the Deaf and Hard of Hearing Communities. The Defendants must prove they serve the Deaf and Hard of Hearing Communities by free will involvement, not forced into their service. Since State funds and Federal funds are commingled by the State of Michigan, the Defendants cannot receive State funds as well so the Defendants cannot go through the State of Michigan to receive Federal funds. This is to include the training of all doctors and staff in dealing with the Hearing Impaired and providing assistive and auxiliary aids and services for the Hearing Impaired. They must also be trained in the Deaf and Hard of Hearing Cultures and means of communication. Wherever a phone number is listed, it must also contain the type of phone it refers to ("Voice," "TDD/TTY,"

Budd0018

"Videophone," "Text Only," or any other future technology the Deaf use to communicate. Staff and doctors must always verify the type of phone number and the correct number to contact. The Doctors and Staff must all be trained and tested in the use of these technologies and how to use the Relay System.

The US Social Security Administration must be notified that the filing of the report by Dr. Brown in 2010, or thereabout, was based upon a "False Diagnosis" and is repealed. All other filings of this "False Diagnosis" must be abolished from the respective Federal/State agencies. This includes the agency that forbids me to own a firearm for self-defense or even go to friends who possess firearms. Copies of all documents must be sent to the Plaintiff.

On the **Michigan Persons with Disabilities Act 220 Issue**, the Plaintiff requests fines equal to the federal ADA and Section 504 Issues above, since the State does not publish a limit on the penalties. Therefore, the amount must be the same as for Issue 1 and 2 above **($3,000,000)**, State standards cannot be substandard to Federal Standards.

On the **Medical Malpractice Issue**, the Plaintiff requests fines for each of the 4 points for $280,000, the limit set by the Michigan Legislature. However, this Federal Court is not bound by the State Legislature's value. Therefore, Plaintiff requests **$1,000,000 for each year the Plaintiff suffered due to the negligent injury caused by the Defendants and continuing for the life of the Plaintiff (estimated to age 86, but could extend longer).** The Defendants must pay for all treatments and medications for the effects of **Tardive Dyskinesia (including but not limited to high blood pressure and sleep assistance)** for the life of the Plaintiff. These treatments must be through an independent medical physician(s) determined by the Plaintiff's Primary Care Physician, Dr. Mark

19

Henry, Wattles Park Family Practice, Battle Creek, Michigan.

On the **False/Unlawful Imprisonment Issue**, the Plaintiff requests fines for **$3,000,000** for the 20-day Unlawful Imprisonment for forcing the Plaintiff into the Mental Hospital under duress against the Defendant Bronson Behavioral Health Services. For each of the appointments, the Plaintiff was forced to attend under threat of being recommitted to Defendant Mental Hospital for failure to appear at all dates set by Defendants Summit Pointe and/or Summit Pointe South. These included weekly appointments with a case manager for the years **2007 to 2010 ($100,000 x 228 appts = $22,800,000) + ($100,000 x 20 appts (2006) = 2,000,000) = $24,800,000** as well as monthly doctor dates with Drs. Rao or Brown **2006 ($100,000 x 5 = $500,000) + for years 2007-2010 ($100,000 x 48 = $4,800,000) = $5,300,000**. Quarterly meetings with PA Pujah for years **2010 to 2012 ($100,000 x 9 = $900,000)**. For Quarterly appointments with various doctors and Pas for the year **2013 ($150,000 x 4 = $600,000)**. For the year **2014 ($160,650 x 4 = $642,600).** For the year **2015 ($172,056.15 x 4 = $688,224.60).** For the year **2016 ($184,272.14 x 4 = $737,088.55).** For the year **2017 ($197,355.46 x 4 = $789,421.83).** For year **2018 ($211,367.70 x 4 = $845,470.78).** For the year **2019 ($226,379.81 x 4 = $905,499.23).** Each year thereafter it goes up 7.1%.

| 2006-2010 | $30,100,000 |
|-----------|-------------|
| 2010-2012 | $ 900,000 |
| 2013 | $ 600,000 |
| 2014 | $ 642,600 |
| 2015 | $ 688,224.60 |
| 2016 | $ 737,088.55 |
| 2017 | $ 789,421.83 |

20

| | | |
|---|---|---|
| 2018 | $ | 845,470.78 |
| 2019 | $ | 905,499.23 |

**$36,208,304.99 for Defs. Summit Pointe & South only**

Finally, the Plaintiff requests **Punitive Damages** against all Defendants for the magnitude of the injuries and damages caused over the years and for the continued suffering and harm to the Plaintiff's reputation and standing in his family and communities.

| | |
|---|---|
| Issue 1 | 3,000,000 |
| Issue 2 | 3,000,000 |
| Issue 3 | 3,000,000 |
| Issue 4 | 7,680,508.29 |
| Issue 5 | 3,000,000 |
| **Subtotal** | **19,680,508.29** |
| **Punitive (x3)** | **$59,041,524.87** |
| **Total/Defendant** | **$78,722,033.16** |

The Plaintiff requests this June 2013 amount be raised by 7.1% per year as allowed by Congress in 28 CFR Parts 36 and 85 Section 233.504. This is **$7,680,508.29** for years 2014-2019. For a **total of $78,722,033.16** per Defendant through 2019. As of **January 1, 2020 payment due is $1,616,316.09**. Each year after that for the life of the Plaintiff, each Defendant must pay on January 1 the amount of the previous year plus the amount of times 1.071 of that previous amount to give the total due for the new year. This continues until the year, or part of the year, of the Plaintiff's death.

As for a **non-monetary judgment**, the Defendants must each prove to this court and to the Plaintiff that all doctors and staff have been appropriately trained in dealing with the Deaf and Hard of Hearing communities in regards to their ADA, Section 504, and Michigan Persons with

21

Budd0021

Disabilities Rights. They must also be trained in the Culture and Belief systems of the Deaf and Hard of Hearing as to their proper diagnosis of Mental Illness or related mental disorders. The Defendants cannot depend upon the Hearing Culture and Belief Systems currently being used on the Deaf and Hard of Hearing. The Defendants and their doctors and staff must undergo basic communications training to communicate with the Deaf and Hard of Hearing until an interpreter can arrive. The VRI (Video Remote Interpreter) Service is inadequate as every time it has been used with the Plaintiff both the Interpreter and the Plaintiff could not understand each other because of poor connections and all-out drop of the link. The VRI System Bronson uses fails to meet the federal standard of "Qualified" Interpreters. Defendants must periodically give random tests of skills dealing with the Deaf and Hard of Hearing to all doctors and staff to include fundamental communication skills. These random tests must be shown to the Court and to the Plaintiff to prove compliance with this judgment.

Bronson Behavioral Health Services must also provide TTY, Videophones, and other technologies to the Deaf and Hard of Hearing patients in their care at all times and promptly (15 minutes or less from the time of the request.). The Defendants cannot restrict the Deaf and Hard of Hearing abilities to communicate with doctors, staff, and the outside world.

It is deemed Medical Malpractice for a doctor to meet with a Deaf patient without an Interpreter present. Only in the emergency room or under emergency conditions can it be allowed. Then the VRI Service is permitted until a live Interpreter can arrive at the location. The Interpreter must be notified immediately and on the way to the site.

No Doctor or Staff may deny medical care to a Hearing Impaired person to bypass the requirement to provide assistive listening devices or any service the Hearing Impaired need to use.

22

Budd0022

No Doctor or Staff may require the Hearing Impaired to bring their own Interpreter or have a family member/friend/companion who signs to stand in as an Interpreter to avoid providing one for the patient or companion. This violates State Law, which requires all Interpreters to be certified by the State. Denying service under this requirement is deemed Medical Malpractice. It is failing to meet the standard of proper communication.

No documents can be accepted without a Sign Language Interpreter, and the opportunity to have one is made. The Deaf and Hard of Hearing must be given written notice that they have the right to a Sign Language Interpreter and/or assistive listening devices before seeing doctors and/or staff. Michigan State laws regarding VRI Service and the Rights of the Deaf and Hard of Hearing must be provided to each Deaf and Hard of Hearing patient in writing (Basic English since many Deaf cannot read English well. It is a foreign language to the Deaf).

Sign Language is based on concepts, not words as in English. There is no written form of ASL. The Interpreter must take English and change into concepts the Deaf can understand with limitations. The Interpreter takes the Sign concepts and puts them into words that can only approximate the meaning of the Sign. The two languages do not meet as well as two voice languages because they have nothing in common.

## REPORTING and MONITORING

**Patient Feedback**, the Defendants, will develop a form to collect feedback from Patients and Companions regarding the provision of auxiliary aids and services. Such a structure will assess Patient and Companion satisfaction with the quality of the auxiliary aids and services provided, the effectiveness of communication with Defendants' doctors and staff, and response times.

23

Budd0023

**Compliance Reports** Beginning three months after the effective date of this judgment and every six months after that for the entire time of the Defendants' operation will provide a written report ("Compliance Report") to the Court's Office and the Plaintiff regarding the status of its compliance with this Judgment. The Compliance Report will include data relevant to the judgment, including, but not limited to:

a. the number of requests for qualified sign language interpreters received by the Defendants from Patients and Companions;

b. the number of times a qualified sign language interpreter was provided by the Defendants;

c. the number of times the Defendants denied a request for a qualified sign language interpreter and the reason for each denial;

d. the number of times the Defendants chose to provide video interpreting services rather than a qualified sign language interpreter in response to a request for a qualified sign language interpreter. Give the reason and all steps taken to secure a qualified interpreter (including who, contact information, when was the service for and when the service was requested, reason service could not provide one, and all other pertinent details about the request);

e. the number of times a request for a qualified sign language interpreter was accepted by the Defendants, but the interpreter failed to appear, and the reasons for the failure (who was the interpreter and contact information);

f. the date and the time a qualified sign language interpreter was requested by a Patient or Companion, the date and time the interpreter arrived, and the date and time the interpreter actually began interpreting for such Patient or Companion;

24

Budd0024

g. an explanation of the reasons for the delays in obtaining qualified sign language interpreters in those cases where the response times failed to comply with the time frames of reasonable due process;

h. the number of redeterminations performed

**Redetermination, the Defendants,** shall reassess its determination of which appropriate auxiliary aids and services are necessary, in consultation with the Patient or Companion, when a Patient or Companion indicates that communication has not been effective. The Defendants will document any instances where Patients or Companions report that the auxiliary aids and services provided by the Defendants failed to ensure effective communication. The Defendants will record any redeterminations and the results of any redeterminations. And the consequences of these redeterminations; These reports will be filed with the Court and the Plaintiff.

i. the number of complaints received by the Defendants from Patients and Companions regarding auxiliary aids and services and/or effective communication, and the resolution of such charges including any supporting documents;

j. Documentation of compliance with all of the training and technology provisions of this Judgment;

k. Defendants must call via Relay, notifying the Relay of the type of phone the Deaf or Hard of Hearing uses. No automated calls to the Hearing Impaired or prerecorded messages are allowed. The Defendants must use a live person to communicate with the Hearing Impaired.

l. Copies of all feedback forms referenced; and

M. Copies of all logs.

**Records** the Defendants will maintain appropriate records to document the information contained in the Compliance Reports and will make

Budd0025

them available, upon request, to the Plaintiff, as allowed by state and federal law.

Finally, the Plaintiff requests that he be declared mentally sane without Paranoid Schizophrenia and not a Terrorist. The Plaintiff also seeks the protection of himself and all assets from all Federal and State/Local agencies who may now try to kidnap or steal the Plaintiff's assets or technologies under the color of the FISA Laws or FISA Court Orders. The Plaintiff also requests orders to block any attempt to wiretap phones or internet connections (including blocking internet service) or email addresses or any other electronic surveillance methods, including his home and vehicle.

The Plaintiff must be free and safe to develop his technologies without Federal, State, or Local interference or threat.

**CERTIFICATION:**

Certification and Closing Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

**For Parties Without an Attorney:**

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Budd0026

1

Signed,

2

3

4
Dated: 6-12-19

5
Don R. Budd, In Pro Se

6
100 Minges Creek Place, Apt F-111

7
Battle Creek, MI 49015-4285

8
TTY Only (269) 979-8516

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Budd0027